UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| RICHARD JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:09-cv-0688 |
| v. | ) | |
| | ) | |
| ERIC SHINSEKI, Secretary, U.S. | ) | JUDGE SHARP |
| Department of Veterans Affairs, | ) | MAGISTRATE JUDGE GRIFFIN |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Defendant Secretary of the Department of Veterans Affairs ("Defendant") filed a Motion for Summary Judgment (Docket Entry No. 35), to which Plaintiff Richard Jones ("Plaintiff") filed a response (Docket Entry No. 47), and Defendant filed a reply (Docket Entry No. 55). Defendant has also moved for leave to file a brief in support of his motion in excess of the page limit set forth in Local Rule 7.01(a) (Docket Entry No. 36), and Plaintiff has not responded. The Court will grant the motion for leave to file excess pages. For the reasons discussed herein, the Court will also grant Defendant's motion for summary judgment, and this case will be dismissed.

## FACTS

On March 2, 2008, Plaintiff began working as the Assistant Logistics Manager at the Alvin C. York Veterans Affairs Medical Center ("York VA") in Murfreesboro.[1] Plaintiff was 56 years old at the time of hire and the first employee to fill this new position. Plaintiff was appointed subject to a one-year probationary period, during which time Defendant had

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Entry Nos. 42 and 50) and related declarations and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. ZenithRadio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

the power to "unilaterally terminate [his] agreement based solely on the management needs of the system." (Docket Entry No. 37-1, Exhibit 7, at 40.)[2] Past the one-year probationary period, however, Defendant would have to put Plaintiff on a performance improvement plan and impose several layers of progressive discipline before dismissing Plaintiff.

Vincent Reed ("Reed") hired Plaintiff and served as Plaintiff's second-line supervisor throughout his employment with Defendant. When Plaintiff began the position, his immediate supervisor was Tona Braithwaite ("Braithwaite"). Reed testified that Braithwaite was not happy with Plaintiff's performance from the beginning. (Docket Entry No. 36-6, Exhibit 3, at 23-24.)

Plaintiff testified that, in June 2008, he was attending a staff meeting at Braithwaite's home. Plaintiff overheard Braithwaite say to other employees that "she wished she hadn't hired someone that just came here to retire." (Docket Entry No. 36-3, Exhibit 1, at 51:21-23.) Plaintiff testified that Braithwaite was looking at him when she made this statement, so he believed that Braithwaite was speaking of him.

Larry Henderson ("Henderson"), an inventory management specialist at the York VA, testified that, in the spring or summer of 2008, he overheard Braithwaite tell someone else, "We need to get rid of these old farts and bring some new blood in." (Docket Entry No. 37-8, Exhibit 14, at 11:17-19.) He did not know whom Braithwaite was speaking with or whom she intended to include in her remark.

By the summer of 2008, Reed became concerned that Plaintiff did not understand his job responsibilities. Therefore, Reed arranged for Plaintiff to spend a week at the VA

---

[2] S*ee also* Docket Entry No. 1 (Complaint) ¶ 12 (alleging that Defendant could terminate Plaintiff without cause during the one-year probationary period, but only with cause thereafter).

hospital in Louisville, Kentucky in August observing the operations there. The Louisville staff uniformly concluded that Plaintiff did not believe the week of observation was necessary, as Plaintiff was not interested in their operations and preferred to talk about his past leadership positions. Upon Plaintiff's return from Louisville, Braithwaite remained concerned that Plaintiff did not interact enough with the various departments under his supervision. Therefore, she attempted to have Plaintiff work alongside his employees in order to understand their responsibilities better, but Plaintiff was not consistent in his shadowing duties.

In September 2008, Plaintiff's supervisors discovered that Craig Mooneyham ("Mooneyham"), an employee in the Inventory Management Section under Plaintiff's supervision, was working an exceptional amount of overtime because his workload was increasing and he did not have enough help. Plaintiff had not been aware that the overtime was occurring. Higher-level supervisors were concerned that Plaintiff was not familiar with the underlying issues within the section that caused Mooneyham to work the overtime and with the budgetary implications of employees working extensive amounts of overtime. (Docket Entry No. 36-9, Exhibit 4, at 84:23—85:7.)

Shortly before her promotion to an out-of-state facility, Braithwaite rated Plaintiff "Fully Successful" on his annual performance evaluation in October 2008. (Docket Entry No. 37-2, Exhibit 8.) Braithwaite testified that, if she had not been preparing to take another position, she instead would have extended the rating period three months and placed Plaintiff on a performance improvement plan. (Docket Entry No. 36-5, Exhibit 2, at 60:4-9.) To show her dissatisfaction with Plaintiff's performance, Braithwaite added narrative comments concerning the importance of Plaintiff's "tak[ing] a stronger leadership role" to succeed in the position.

3

Trey Childress ("Childress") became Plaintiff's immediate supervisor after Braithwaite departed. According to Plaintiff's testimony, Childress told him not to worry about a "Fully Satisfactory" rating because Plaintiff's rating would "have to be a lot worse" to lose his job at the end of the probationary period. (Docket Entry No. 36-4, Exhibit 1, at 108:7-10.) Childress testified that he could not reduce Plaintiff's "Fully Satisfactory" rating because that reduction would have first required placing Plaintiff on a performance improvement plan. (Docket Entry No. 36-8, Exhibit 4, at 43:22—44:4.)[3]

Shortly after Plaintiff signed off on his performance evaluation, Reed and Childress met with Plaintiff regarding Plaintiff's transition in supervisors. Reed and Childress acknowledged that Plaintiff attributed his performance-related problems to that point on Braithwaite's management style. Therefore, Reed informed Plaintiff that he was starting from a "clean slate." (Docket Entry No. 36-5, Exhibit 3, at 23:3.) Reed also told Plaintiff that, if things did not improve, he would be let go at the end of the probationary period. (*Id.* at 41:21-23.) Plaintiff testified that, by the end of this meeting, "there was no doubt that [Plaintiff] had some improvements to make." (Docket Entry No. 36-4, Exhibit 1, at 116:14-17.) Furthermore, Plaintiff pledged to Reed and Childress that he would resign at the end of the probationary period if he did not feel that he was doing a good job. (*Id.* at 117:12-19.)

Despite the events at this meeting, Plaintiff continued to have performance-related issues for the remainder of his probationary period. When he began the position, his supervisors had informed him about a particular subordinate who had given all her

---

[3] Childress's testimony appears to be factually incorrect. According to the testimony of two human resources specialists, probationary employees do not need to be placed on a performance improvement plan before they can receive a rating below "Fully Satisfactory."

employees "outstanding" performance ratings the prior year. Plaintiff was instructed not to let this situation happen again. Nonetheless, under Plaintiff's supervision, the same subordinate again awarded "outstanding" ratings to all her employees at the end of 2008. Supervisors above Plaintiff ultimately disapproved of such high ratings across the board, but some ratings had to be changed back to "outstanding" after certain employees filed union grievances. During the process, some evaluations came up missing, and there were allegations in Plaintiff's office that other evaluations had been forged.

In January 2009, the York VA facility was installing sterilization equipment in the Sterile Process and Distribution ("SPD") decontamination room. After being alerted by Kenyon Dupre ("Dupre"), the Supervisory General Engineer, that Plaintiff did not seem engaged, Reed asked Plaintiff to provide a time line for the installation. Finally receiving the timeline after multiple requests, Reed decided to re-do it because he did not believe that Plaintiff had prepared it accurately. On this project Dupre described Plaintiff as "lost" and "not engaged in the operations of the medical center" and said that Plaintiff "only reacts and doesn't lead." (Docket Entry No. 38-4, Exhibit 21.) After a briefing to the network director concerning the same project, Jim Hayes ("Hayes"), Chief Financial Officer, contacted Reed because Plaintiff had provided some incorrect numbers for the presentation without first checking with Hayes. (Docket Entry No. 36-7, Exhibit 3, at 65:2-12.)

During the same time period, an incident involving the improper use of a piece of tubing in the York VA's endoscopy lab prompted a national alert and a visit from an inspection team. Childress had to contact Plaintiff the day before the team arrived about cleaning up some boxes that should have been removed well beforehand. Reed concluded

that Plaintiff was "not engaged" in the aftermath of the incident and mismanaged the resistance from clinical staff regarding the implementation of new procedures.

On February 14, 2009, Paul Johnson ("Johnson") became Plaintiff's immediate supervisor. When Reed asked about the prospect of terminating Plaintiff, Johnson responded, "if he's a problem employee, deal with him now." (Docket Entry No. 38-5, Exhibit 22, at 11:13-14.)

In late February 2009, as the end of Plaintiff's probationary period neared, Reed and Childress consulted with John Henderson of the York VA's human resources department. John Henderson testified that Defendant could remove Plaintiff's supervisory authority and retain him in federal service or terminate Plaintiff from federal employment altogether. (Docket Entry No. 38-9, Exhibit 26, at 6:16-18.) In making his decision, Reed consulted Plaintiff's supervisors and lead customers and determined that none of them recommended Plaintiff's retention. Therefore, Reed decided to terminate Plaintiff and had John Henderson prepare the termination letter, which stated that, during the probationary period, Plaintiff had "not demonstrated the capacity to effectively manage [his] area of responsibility or supervise [his] subordinate staff." (Docket Entry No. 38-10, Exhibit 27.)

On February 27, 2009, Reed prepared a "Memorandum for Record" documenting the decision not to keep Plaintiff beyond the probationary period ("Memorandum"). (Docket Entry No. 38-1, Exhibit 18.) The Memorandum describes the concerns about the logistics at the York VA facility that Plaintiff learned about when he began the position. It also mentioned the "counseling sessions" conducted during the course of the probationary period when Plaintiff did not handle these concerns adequately, including the October 23, 2008 meeting with Reed and Childress. The Memorandum presented concerns about Plaintiff's tendency to convey decisions from upper management in a way

6

that made clear they were not his decisions and he was following the decisions of others. Finally, the Memorandum lists the supervisors and lead customers from whom Reed collected feedback leading up to the end of the probationary period and describes this feedback as "universally g[iving] a 'no confidence' vote." Ultimately, the Memorandum concludes that "it would be very difficult" to justify retaining Plaintiff after the probationary period.

Later in the day on February 27, Reed and Childress informed Plaintiff of the termination decision. Toward the end of that meeting, Plaintiff testified that Reed said, "We have to terminate you now or let you retire." (Docket Entry No. 36-4, Exhibit 1, at 142:11-12.) At that point, Plaintiff refused to sign the termination letter and walked out. Plaintiff's subsequent attempt to resign his position fell through because Plaintiff refused to forego appeals of his termination in exchange for the resignation. Plaintiff was 57 years old at the time of termination.

Danny Moss ("Moss"), then the Assistant Chief of Logistics at the VA hospital in Nashville, began covering the duties of Plaintiff's position in Murfreesboro in addition to the duties of his position in Nashville. Defendant tried to fill Plaintiff's position competitively from the outside but was not successful. Ultimately, Moss was permanently transferred to Murfreesboro on December 22, 2009 to fill Plaintiff's former position at the York VA, which he effectively assumed on February 28, 2010. Mooneyham applied and was selected for the position Moss had held at the Nashville VA. At the time of these decisions, Moss was 44, and Mooneyham was 39.

## ANALYSIS

Plaintiff, a 57-year-old adult at the time of termination, asserts a single claim of age discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended,

7

29 U.S.C. § 621 *et seq*. He alleges Defendant discriminated against him on the basis of age by terminating his employment. Defendant has moved for summary judgment on that claim.

I.     **Summary Judgment Standard**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Age Discrimination in Employment Act Claim

Under the Age Discrimination in Employment Act ("ADEA"), it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his . . . employment" based on age. 29 U.S.C.A. § 623(a)(1) (2008). To establish the employer's liability, the employee must prove by a preponderance of the evidence that age is the but-for cause of the employer's decision. *Gross v. FBL Fin. Servs., Inc.*, ___ U.S. ___, 129 S. Ct. 2343, 2351 (2009); *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). An employee may establish an age discrimination case by direct or circumstantial evidence. *Id.* Here, Plaintiff attempts to resist summary judgment by alleging the record presents evidence of both types to create a genuine issue of material fact for trial. The Court considers each type of evidence in turn.

### 1. Direct Evidence

Direct evidence of discrimination "'requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Geiger*, 579 F.3d at 620 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)). In evaluating whether age-related statements show bias, the Sixth Circuit has directed courts to consider "'(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.'" *Morgan v. N.Y. Life Ins. Co.*, 559 F.3d 425, 432 (6th Cir. 2009) (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002)). Here, Plaintiff cites as direct evidence Braithwaite's statements that she "wished she hadn't hired someone who just came [to the VA] to retire" and that "we need to get

rid of these old farts and bring some new blood in" and Reed's statement, allegedly made at the time of Plaintiff's discharge, that "we have to terminate you now or let you retire."

These statements do not qualify as direct evidence of discrimination. Braithwaite's statements were not made in relation to the decision to terminate Plaintiff, nor was Braithwaite a decision-maker in the termination to begin with. *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998). Braithwaite made these statements before leaving her employment with the York VA facility, and her departure took place four months before Plaintiff's termination. She was just one of six "supervisors and lead customers" whom Reed consulted before he decided to terminate Plaintiff. As for Reed's comment about terminating Plaintiff or letting him retire, it does not require the conclusion that age-based discrimination motivated Plaintiff's termination. Instead, in the context of an employee nearing the end of a one-year probationary period, it references the several layers of disciplinary action that an employer must go through before dismissing an employee who has completed the probationary term. While the Court will consider these statements in its circumstantial evidence analysis, none of them provides direct evidence of discrimination.

2.      **Circumstantial Evidence**

In the absence of direct evidence, Plaintiff's ADEA claim is analyzed under the familiar evidentiary framework for cases based on circumstantial evidence set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973). *Cf. Geiger*, 579 F.3d at 622. Under that framework, Plaintiff must first establish a prima facie case of age discrimination. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)). If he carries that burden, the burden shifts to Defendant to present a legitimate, non-discriminatory reason for its actions. *Id.* at 410 (citing

*Kline*, 128 F.3d at 342). Upon Defendant's offer of such a reason, the burden shifts back to Plaintiff to present sufficient evidence of pretext for the jury to reject the Defendant's explanation. *Id.* at 411-12; *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008);

To establish a prima facie case of age discrimination under the ADEA, Plaintiff must show that (1) he is a member of a protected class; (2) he was discharged; (3) he was qualified for the position that he held; and (4) he was replaced by a person outside the protected class. *See Geiger*, 579 F.3d at 622 (citing *Allen*, 545 F.3d at 394). Defendant does not dispute that Plaintiff has established the first three elements of the prima facie case but contends that Plaintiff cannot establish that he was "replaced" by a younger employee. After Plaintiff's termination, his contemporary at the VA's Nashville facility, Moss, performed both jobs while Defendant unsuccessfully sought to fill the position competitively. Only after a year did Moss formally assume Plaintiff's position in Murfreesboro. Defendant cites *Grosjean v. First Energy Corp.*, which explains that "[a] 'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.'" 349 F.3d 332, 336 (6th Cir. 2003) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).

A straightforward application of the facts of *Grosjean*, however, defeats Defendant's argument. In *Grosjean*, after the employer demoted the plaintiff to a non-supervisory position, another supervisor took over the plaintiff's supervisory duties "on a temporary basis," working more than a thousand hours of overtime during a ten-month period before the employer hired someone else to fill plaintiff's position. *Id.* at 334. The Sixth Circuit held that the plaintiff "was replaced, in both the colloquial and the legal meanings of that term" by the employee eventually hired to fill plaintiff's position. *Id.* at 336. In this case, while Moss took on Plaintiff's duties in

addition to his own duties for a time, he "replaced" Plaintiff because he was eventually reassigned to Plaintiff's position. Plaintiff has made out the prima facie case of discrimination.[4]

In response to the prima facie case, Defendant has set forth a legitimate, non-discriminatory reason for Plaintiff's termination: poor job performance in the position of Assistant Logistics Manager. *See Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003); *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001). Therefore, the burden shifts back to Plaintiff to show that a genuine issue of material fact exists as to whether Defendant's reason is really a pretext to mask intentional discrimination. Plaintiff may establish that the proffered reason is pretext in one of three ways: Defendant's reason (1) lacks any basis in fact, (2) was not the actual motivation for Plaintiff's termination or (3) is not sufficient to warrant termination. *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). As the Sixth Circuit has said of the pretext analysis, "it is important to avoid formalism in its application, lest one lose the forest for the trees. Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). Under the Sixth Circuit's "honest belief" rule, the court asks "'whether the employer made a reasonably informed and considered decision before taking the complained-of action'" but does not "'require that the decisional process used by the employer be optimal or that it left no stone unturned.'" *Allen*, 545 F.3d at 398 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007)). Therefore, an employee cannot establish pretext by showing that the employer's legitimate reason for discharge is

---

[4] Nor does the Court find persuasive Defendant's citation to an unpublished decision from a district court outside the Sixth Circuit. *See Loughnane v. Price Costco Wholesale*, No. 96-20298, 1998 WL 78086 (N.D. Cal. Feb. 10, 1998). *Loughnane* is also factually distinguishable because the employer in that case manifested an "undisputed earnest desire to hire someone older than" the plaintiff by initially offering plaintiff's position to an older employee. *Id.* at *4. Thus, the plaintiff could not make out the fourth element of the prima facie case.

ultimately incorrect. *Majewski*, 274 F.3d at 1117 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

Plaintiff's evidence of pretext essentially falls into the following categories: the statements made by Braithwaite and Reed, the "Fully Satisfactory" evaluation that Plaintiff received in October 2008, factual errors and inconsistencies in the Memorandum of Record that Reed prepared right before terminating Plaintiff, and confusion regarding the identity of the decision maker who terminated the Plaintiff. The Court considers each category in turn.

As previously discussed, the statements by Braithwaite are significantly removed in time from Plaintiff's actual termination, and, while Reed listed Braithwaite as one of six people whom he consulted about plaintiff's performance, she was not a decision maker in the termination. Still, Plaintiff maintains that Braithwaite's statements reveal "a corporate state-of-mind or a discriminatory atmosphere" that impacted the ostensibly neutral termination decision in this case. *See Conway v. Electro Switch Corp.*, 825 F.2d 593, 597-98 (1st Cir. 1987) (holding that trial court properly admitted discriminatory statements made eight to ten months before plaintiff's termination). The undisputed facts show, however, that Reed and Childress considered Plaintiff's job performance independent of Braithwaite's perspective and found Plaintiff's performance inadequate. After Braithwaite left the company in October 2008, they explained to Plaintiff that he was starting with a "clean slate" and had the remainder of the probationary period to prove he could excel in the position. Nonetheless, Plaintiff's job performance in the remaining months continued to fall short of his supervisors' expectations, leading Reed to conclude that he could not justify keeping Plaintiff beyond the probationary period.[5]

---

[5] Relatedly, the Court is aware that a non-decision maker can taint the process in a way that subjects the employer to liability, even though the ultimate decision maker did not intend unlawful discrimination. *See Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 877 (6th Cir. 2001) (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405-06 (7th Cir. 1990)). That theory does not apply to this case. Reed's decision to terminate Plaintiff reflected an independent determination

With regard to Reed's statement about the choice to terminate plaintiff or allow him to retire, nothing in the context suggests that Reed "use[d] 'retire' as a proxy for 'too old' or some other derogatory, age-based term." *See Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006). A mere reference to retirement does not sufficiently indicate discrimination on its own, absent some supporting evidence of a motive to discriminate based on age. *See Barnhart v. Pickrel, Schaeffer, & Ebeling Co.*, 12 F.3d 1382, 1394-95 (6th Cir. 1993). Here, Reed was deciding whether to let Plaintiff go at the end of the probationary period, when he could be terminated without cause, or allow Plaintiff to achieve permanent status, which requires several steps of progressive discipline prior to termination. None of the distinctions between probationary and permanent status bears on the Plaintiff's age. Thus, the mere reference to "retirement" does not sufficiently indicate age-based discrimination on its own.

Plaintiff goes on to argue that the "Fully Satisfactory" rating made by Braithwaite and seconded by Childress in the October 2008 evaluation negates Defendant's contention that poor job performance was the reason for Plaintiff's termination. Plaintiff maintains that the trier of fact must determine whether Childress was honestly mistaken when he testified that he could not downgrade Plaintiff's rating because Plaintiff had not already been placed on a performance improvement plan. Plaintiff also points to the testimony of Joseph Dassaro, an employee in Defendant's HR department in Murfreesboro, who testified that he could not recall a probationary employee being terminated after receiving a "Fully Successful" rating.

However, the undisputed facts establish that Defendant made clear to Plaintiff during the October 2008 evaluation that he would need to improve his performance to keep his job, regardless of the nominally satisfactory rating that he had received. While Braithwaite assigned

---

based on (1) issues with Plaintiff's performance that continued after Braithwaite's departure and (2) consultation with other individuals (besides Braithwaite) who are not subject to allegations of discrimination. The record sets forth no evidence to support the contention that Braithwaite had "decisive" influence in Reed's decision to terminate Plaintiff.

Plaintiff the "Fully Satisfactory" rating as she prepared to take a position in another state, she included a narrative explaining that, "[i]n order for [Plaintiff] to succeed in this position, he will need to take a stronger leadership role." The narrative goes to describe how that, whenever higher-level supervisors alerted him to a problem, Plaintiff would let the employee know that someone else brought the matter to his attention. The narrative described this practice as "not taking the leadership role and not providing support to his higher level supervisors." Based on his meeting with Reed and Childress shortly after the performance evaluation, Plaintiff testified, "there was no doubt that [he] had some improvements to make . . . just from the verbal feedback [he] got back from [Childress] at the performance appraisal." In his testimony, Plaintiff further admitted telling Reed and Childress that, if his performance did not improve in the remainder of the probationary period, he would resign from his position instead of Reed having to let him go.

As for Dassaro, he testified that the narrative on Plaintiff's performance evaluation was atypical because the "Fully Successful" rating would not require a narrative. Dassaro further agreed that the identification of performance deficiencies in the narrative put Plaintiff on notice as to the areas he needed to improve and that, if he did not improve by the end of the probationary period, Defendant would have cause to terminate him. Although Dassaro could not recall whether any probationary employees had been terminated for performance-related issues after receiving a "Fully Successful" rating, John Henderson testified that he could recall three or four probationary employees who received a "Fully Successful" evaluation but were then terminated for performance-related issues. In summary, under the facts of this case, the "Fully Successful" rating that Plaintiff received in October 2008 does not create a triable question of fact as to whether Defendant had performance-related reasons for terminating plaintiff in February 2009 or actually terminated Plaintiff for those reasons.

Plaintiff argues that the "Memorandum for Record" provided by Reed to Plaintiff at the time of termination contains abundant evidence of pretext. In evaluating these contentions, the Court is mindful that challenging the soundness of the employer's business judgment does not establish age discrimination. *See Majewski*, 274 F.3d at 1116; *Lopez v. Computer Network Tech. Corp.*, 128 F. Supp. 2d 1061, 1066 (E.D. Mich. 2001). Furthermore, disputing the facts that provided the basis for the discharge is also not enough to survive summary judgment. *Abdulnour*, 502 F.3d at 502 (citing *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)). Plaintiff objects to the Memorandum's discussion of the performance ratings within Plaintiff's department, contending that the ratings assigned by Plaintiff's subordinate were likewise approved by higher levels of supervisors within the organization. Plaintiff further points to Childress's instruction to raise the rating of an employee who had been deployed in Iraq for much of the year so the employee would receive a bonus. Also, Plaintiff objects that the Memorandum's reference to a forged document as an example of Plaintiff's lack of control and oversight over his department is a non sequitur because Plaintiff could not have "controlled" a document that someone forged.

The Court finds that these arguments do not undermine Defendant's "honest belief" that Plaintiff needed to be terminated because he was insufficiently hands-on in his leadership style. The issues with his department's performance ratings and the forged documents are mere examples, emblematic of a larger problem with Plaintiff's managerial style. When Plaintiff began the position, he was advised about his subordinate's prior practice of promising employees outstanding ratings and then blaming upper management when those ratings were not awarded. Despite being placed on notice, Plaintiff let the situation happen again by signing off on a set of unrealistically high ratings. The fact that Childress asked Plaintiff to adjust upward one rating under extenuating circumstances does not bear on the issue of an entire department receiving

unrealistically high ratings. As for the forged document, the issue is not who "controlled" the document; instead, the point is that the emergence of a forged document from within Plaintiff's department demonstrated his lack of hands-on control.

Furthermore, according to Plaintiff, the Memorandum criticizes his performance in matters of warehouse operations for which other supervisory officials were not reprimanded and which Braithwaite had also failed to address before his hiring without being reprimanded. To the extent Defendant treated Plaintiff differently from his subordinates or from Braithwaite for the same managerial oversights, this difference does not make out a case of disparate treatment because Plaintiff, himself a probationary employee, is comparable only to other probationary employees. *See Goller v. Ohio Dep't of Rehab. & Corr.*, 285 F. App'x 250, 256 (6th Cir. 2008); *accord Steinhauer v. DeGolier*, 359 F.3d 481, 484-85 (7th Cir. 2004); *Bogren v. Minnesota*, 236 F.3d 399, 405 (8th Cir. 2000). Furthermore, Plaintiff fails to present any evidence from which the trier of fact could conclude that Defendant's harsher treatment of Plaintiff, if any, was motivated by age-based animus. *See Geiger*, 579 F.3d at 625 (citing *Browning v. Dep't of the Army*, 436 F.3d 692, 696-97 (6th Cir. 2006)).

In the absence of evidence of age-based animus, the Court declines to question the way that Defendant collected feedback about Plaintiff before the conclusion of the probationary period. Plaintiff contends that Reed should have consulted Plaintiff's subordinates instead of Plaintiff's supervisors and leading customers. The law did not require Reed to conduct a perfectly meticulous consultation in determining whether to retain Plaintiff. *See Allen*, 545 F.3d at 398. This decision is a matter of business judgment which the Court must not second-guess. Furthermore, the Court rejects Plaintiff's argument that the supervisors and customers consulted by Reed did not, in effect, offer sufficiently negative feedback to warrant termination. The undisputed facts show that, by the end of the probationary period, Reed's evaluation of

Plaintiff's performance led him to the conclusion that he should terminate Plaintiff. In consulting Plaintiff's other supervisors and customers, Reed learned nothing that would incline him to change his mind. Nothing in this process suggests that Reed acted out of a motivation to discriminate based on age. The individuals listed in the Memorandum offered testimony confirming that Reed did, in fact, consult each of them. Reed consulted with Braithwaite prior to her departure in October 2008 and consulted with the other five toward the end of Plaintiff's probationary period. None of them asked Reed to keep Plaintiff past the probationary period.

Citing an unpublished district court opinion from outside the Sixth Circuit, Plaintiff contends that, in surveying the opinion of individuals who did not have a particularly high level of contact with Plaintiff, Defendant is effectively "piling on justifications" for Plaintiff's termination and thus engaging in context suggestive of pretext. *See Gay v. Timberlake Homes, Inc.*, Civil Action No. RDB-07-1930, 2008 WL 3075588, at *10 (D. Md. Aug. 1, 2008). A review of *Gay* makes clear that, by "piling on," the district court meant the subsequent addition of other reasons for the employee's dismissal besides the reasons originally provided at the time of the decision. *Id.* Here, Defendant's explanation of the reasons for Plaintiff's termination has not changed during the course of the litigation. Therefore, the consultation of other individuals within the organization prior to the Plaintiff's termination does not fit the meaning of "piling on."[6]

---

[6] Plaintiff claims that Reed engaged in conduct that amounts to "piling on" by contacting Braithwaite after Plaintiff's termination in late February 2009. The first instance of such contact, which took place in March or April, is unremarkable because Reed was simply collecting for his files written statements from past supervisors and customers regarding Plaintiff's job performance. The second contact was an admittedly peculiar email correspondence between Reed and Braithwaite in April 2010 when Reed inquired about Braithwaite's recollection of a particular transaction that provided "an example of [Plaintiff] not knowing his job." (Docket Entry No. 51-1, Exhibit 3, at 19.) Nothing came of that correspondence, however. Braithwaite replied the transaction was "[n]ot a good example" of Plaintiff's job performance because it was a complex issue and Plaintiff had not been on the job very long. Defendant has not used it for purposes of the present motion for summary judgment.

Plaintiff seizes on the language in the Memorandum that the individuals consulted by Reed "universally gave a 'no confidence' vote," pointing out that some of these individuals could not recall specifically being asked about their "confidence" in Plaintiff. Similarly, Plaintiff takes issue with the Memorandum's label of "counseling sessions" for conversations that Plaintiff had concerning his job performance with Reed and Childress because these conversations took place in the hallways or at the warehouse rather than inside someone's office. Such disputes over semantics do not create a genuine issue of material fact. The record makes clear that the individuals consulted by Reed did not recommend Plaintiff's retention and that Plaintiff's supervisors periodically discussed performance-related issues with him during the probationary period.

Finally, Plaintiff argues that summary judgment is inappropriate because of contradictory testimony among Defendant's agents as to who made the termination decision. Plaintiff does not clearly explain how a contradiction on this point would create a triable question of pretext. In any event, the record contains no such contradiction. John Henderson testified that Reed and Childress came to him for advice regarding Plaintiff's performance as supervisor and he gave them the options of terminating Plaintiff's supervisory authority while retaining Plaintiff in federal service or terminating Plaintiff altogether. Although Reed initially testified that John Henderson terminated Plaintiff by signing the paperwork, Reed clarified that testimony later in the deposition. When asked if his earlier testimony was accurate, Reed responded that it "was probably a mistake" to have stated earlier that the termination was a human resources' decision and that "the end decision to not retain Jones was my decision." (Docket Entry No. 36-7, Exhibit 3, at 102:13-25.) The undisputed facts make clear that Reed decided to terminate Plaintiff and John Henderson prepared the termination letter at Reed's direction.

Plaintiff has not presented evidence of pretext sufficient to create a genuine issue of material fact. As such, Plaintiff's ADEA claim cannot survive a motion for summary judgment.

## **CONCLUSION**

For all of the reasons stated, Defendant's Motion for Leave to File Excess Pages (Docket Entry No. 36) and Motion for Summary Judgment (Docket Entry No. 35) will be granted. This case will be dismissed with prejudice.

An appropriate Order shall be entered.

*Kevin H. Sharp*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE